IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| VANESTA DAVIS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 16-CV-157-JED-FHM |
| v. | ) |
| | ) |
| CITY OF TULSA, OKLAHOMA, et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

**I.    Background**

The plaintiffs are surviving relatives and personal representatives of the Estate of Deandre Lloyd Armstrong-Starks. Mr. Starks, who was unarmed, was shot in the back by defendant Mark Wollmershauser, Jr., a police sergeant with the Tulsa Police Department (TPD), in the course of execution of a search warrant on a home in Tulsa on March 25, 2014.[1] The plaintiffs brought this action asserting claims against Sgt. Wollmershauser and the City of Tulsa under 42 U.S.C. § 1983. (*See* Doc. 20, First, Second, and Third Claims for Relief). The § 1983 claims are premised upon allegations that Sgt. Wollmershauser used excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs also assert a state negligence claim under the Oklahoma Governmental Tort Claims Act (OGTCA) against the City (Fifth Claim for Relief).

Mr. Starks was not a target of the search warrant, which named two other individuals and authorized the officers to search the premises for "cocaine and other controlled dangerous substances," "monies or unexplained wealth, records and financial records in physical, digital, or

---

[1]   Wollmershauser was a sergeant at the time of the shooting. He was subsequently promoted to the rank of captain after Mr. Starks's death. The City's briefing refers to him as "Sgt. Wollmershauser," and the Court will reference that title herein for consistency.

electronic form, proof of residency, cellular phones, keys, safes, surveillance equipment, [and] firearms." (Doc. 33-7 at 4).[2] Officers discussed in advance a plan for execution of the warrant, which included briefing on the routes of approach, individual officer assignments, contingency plans for fleeing suspects, shots fired on approach or entry, failed breach, evidence destruction, officer down procedures, evacuation procedures, and transport to hospital. An EMSA unit was staged a few blocks away from the premises to be searched.

Three officers were assigned to outside containment, while two additional officers were to cover the bathroom window on the east side of the residence to monitor for potential evidence destruction. Eight additional officers made up the "entry team." Sgt. Wollmershauser was part of the entry team, and he was to be the Emergency Radio Operator on the scene. Upon approaching the front porch, officers believed that they had been "compromised," indicating that the occupants had seen them and recognized them as police. Wollmershauser provided an affidavit attesting that another officer yelled, "Tulsa Police, search warrant; Tulsa police, search warrant" before making entry (*see* Doc. 33-1 at 6). However, the affidavit of Dominique Jones, who was present at the home during police entry, indicates that the TPD officers "entered the house unannounced and without knocking." (Doc. 36-7 at 2). The evidence establishes very fast-moving events and chaos in the house immediately upon the officers' entry.

There are significant, material factual discrepancies as to what happened immediately before Sgt. Wollmershauser shot Mr. Starks in the back. Wollmershauser asserts that he heard "Officer Kirby and one other female voice yelling commands such as 'show me your hands.'" (Doc. 33-1 at 7). Wollmershauser states that he was positioned just to the left and slight rear of

---

[2] All citations to page numbers from documents in the record are to the page numbers at the top of each page as docketed in CM/ECF.

Officer Kirby, who was standing just to the left of Officer Criner. Criner was standing at the right side of the large unobstructed doorway that led from the living room to the dining room inside the house. (*Id.*). Wollmershauser contends that he saw a black male, whom he later learned was identified as Mr. Starks. Starks was kneeling in the corner of the dining room, with his back to the officers. Sergeant Wollmershauser alleges that he could not see Mr. Starks's hands but could see his arms moving, and Wollmershauser believed Starks's hands were located near the front waistband of his pants. (*Id.*). Wollmershauser asserts that "Starks did not comply with the repeated commands to show his hands" and "continued looking down toward his front waistband while kneeling and just kept fumbling with his hands." (*Id.*). At that point, Wollmershauser says he told Starks to "show me your hands. Show me your fucking hands," and then fired one shot at Starks, hitting him in the "mid-right side of his back." (*See id.*). Mr. Starks died later that day. It is undisputed that he was not armed with a gun or other weapon, although the officers allege that, before he was shot, they believed he may have been attempting to retrieve a gun from the waistband of his pants. (*See, e.g.*, Doc. 33 at 9; Doc. 34 at 9, Doc. 34-4 at 8).

Dominique Jones asserts that he was in the home and "personally witnessed the shooting of [Mr. Starks]." (Doc. 36-7 at 2). In stark contrast to the affidavit of Sgt. Wollmershauser and the testimony of other officers, Mr. Jones maintains that Mr. Starks "had his hands in the air" at the time of the shooting. (*Id.*). Jones also states that he never heard anyone say "show me your hands," and he instead heard someone yelling "get on the ground" (*id.*), which is contrary to Sgt. Wollmershauser's assertions. Mr. Jones also alleges that "[t]here were no guns in the house until the Tulsa Police Department showed up with theirs." (*Id.*).

The defendants seek summary judgment on the plaintiffs' claims. (Doc. 33 and 34). Plaintiffs have responded (Doc. 36, 37), and Sgt. Wollmershauser filed a reply (Doc. 40).

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

It is reversible error for a court to weigh the evidence or resolve any disputed factual issues in favor of the moving party. *See Tolan v. Cotton*, 572 U.S. 650, 656-660 (2014) (per curiam). A district court may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *See id.* Thus, importing factual inferences that conflict with the non-movant's evidence is contrary to the "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 660. The reason for this long-standing principle is that "witnesses on both sides come to [the] case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Id.*

### III. Discussion

#### A. Claims Against Sgt. Wollmershauser

##### 1. Underlying Basis for § 1983 Claim

In his motion, Sgt. Wollmershauser first argues that the plaintiffs' § 1983 excessive force claims must be brought under the Fourth Amendment and that such claims should be dismissed with prejudice for failing to "allege any constitutional provision underlying their § 1983 claims." (Doc. 33 at 23-24). However, plaintiffs allege in their Amended Complaint that they seek "to redress deprivations of rights secured by the Fourth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983." (Doc. 20 at 2, ¶ 10). The factual allegations of the Amended Complaint state a plausible excessive force claim under the Fourth Amendment. These allegations are sufficient to avoid dismissal on the first ground asserted by Wollmershauser.[3]

##### 2. Qualified Immunity

Sergeant Wollmershauser asserts that he is entitled to qualified immunity. The general summary judgment standards apply to motions for summary judgment based on qualified immunity, and courts accordingly must still draw the evidence and reasonable inferences in favor of the non-moving party. *See Tolan*, 572 U.S. at. 656-60; *Scott v. Harris*, 550 U.S. 372, 377 (2007). In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Tolan*, 572 U.S. at 655-56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001));

---

3    The City also argues in its motion for summary judgment that plaintiffs failed to plead a claim under the Fourth Amendment. (Doc. 34 at 15-16). For the reasons already stated, that argument fails for the City as well.

*see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan*, 572 U.S. at 656 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). The second prong asks "whether the federal right was clearly established at the time of the violation." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Government officials are shielded from liability if their actions did not violate clearly established federal rights "of which a reasonable person would have known." *Id.* (quoting *Hope*, 536 U.S. at 739). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "*But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.*" *Tolan*, 572 U.S. at 656 (emphasis added). "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (citation omitted).

      **a.**      **First Prong: Violation of a Federal Right**

Claims of excessive force in the course of an investigation, arrest, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 395. "The inquiry into whether this right was violated requires a balancing of 'the nature

and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tolan*, 572 U.S. at 656 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) and *Graham*, 490 U.S. at 396). Evaluation of an excessive force claim requires a court to consider whether the "totality of the circumstances" justified a particular use of force. *See Garner*, 471 U.S. at 8-9.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396-97 (citations omitted). Thus, an officer's evil intentions will not make an objectively reasonable use of force unconstitutional, and good intentions will not make an objectively unreasonable use of force constitutional. *Id.* at 397. Determining whether force was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Taken in the light most favorable to the plaintiffs, the evidence would support a reasonable jury finding that Sgt. Wollmershauser's actions were not "objectively reasonable" under the circumstances. Crediting plaintiffs' evidence, Sgt. Wollmershauser shot Mr. Starks, who was unarmed, in the back, while Mr. Starks was kneeling on the floor, with "his hands in the air." (*See* Doc. 36-7 at 2). While Wollmershauser and other officers insist that Mr. Starks's hands were not in the air and they believed he might be reaching into the front of his pants for a weapon, this Court may not ignore the plaintiffs' evidence, which includes the affidavit of Dominique Jones. *Tolan*,

572 U.S. at 657 ("By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party").

These disputed facts are material to a determination of the plaintiffs' Fourth Amendment claim against Sgt. Wollmershauser. Wollmershauser's arguments for qualified immunity and summary judgment are dependent upon a construction of the facts that is drawn in his own favor, rather than in favor of the non-moving plaintiffs. That is precisely what the Supreme Court rejected in *Tolan*, where the Court noted that there were disputed facts as to the conditions surrounding an officer's shooting of the plaintiff in that case. Those factual issues included whether the front of the home where the shooting occurred was well-lit and whether the plaintiff's statement to the officer to "get your fucking hands off my mom" and other disputed factual circumstances indicated the plaintiff was a threat to the officer. *See id.* at 657-58.

Construing the evidence relating to the *Graham* factors in plaintiffs' favor, other than Mr. Starks's mere presence in the dining room of the home to be searched, officers did not have information that Starks had committed a crime, serious or not, prior to the shooting. Mr. Starks was not a target of the search warrant, and Wollmershauser did not know him prior to the shooting. The *Graham* factor of whether there was active resistance or an attempt to evade arrest also cannot be determined in favor of Wollmershauser at this stage, because the evidence viewed in the proper light would show that Starks was not armed, was kneeling with his hands in the air and his back to the officers, at the time he was shot. The final *Graham* factor at issue here is whether Starks posed an immediate threat to the safety of the officers or others. As noted, the evidence is in direct dispute as to that issue, rendering summary judgment inappropriate. If, as plaintiffs' evidence would show, Mr. Starks was on his knees with his hands in the air when Sgt. Wollmershauser shot

him in the back, a reasonable jury could find that Wollmershauser's actions were unreasonable and amounted to excessive force in violation of the Fourth Amendment.

In short, the factual disputes are material to the issue of the reasonableness of Wollmershauser's actions, and he is thus not entitled to judgment as a matter of law based upon qualified immunity, so long as the law was clearly established under the second prong. The Court will now turn to the second prong.

### b. Second Prong: Cleary Established Law

In analyzing whether the federal right was clearly established at the time of the violation, "'the salient question . . . is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 572 U.S. at 656 (quoting *Hope*, 536 U.S. at 741). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela*, 138 S. Ct. at 1152 (quoting *Brosseau*, 543 U.S. at 198). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (quoting *Mullenix v. Luna*, 577 U.S. __, __, 136 S. Ct. 305, 308-09 (2015)). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful.'" *Id.* (citation omitted). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix*, 136 S. Ct. at 308).

9

While the courts are "not to define clearly established law at a high level of generality," "a case directly on point" is not required so long as "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011); *see also Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 551 (2017); *Kisela*, 138 S. Ct. at 1152. "'General statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness must be apparent." *White*, 137 S. Ct. at 552 (citations omitted). "But the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552).

The conduct of Sgt. Wollmershauser (as that conduct is construed in light of the sworn statements of Dominique Jones) violated clearly established constitutional law. At its core, the "clearly established" inquiry here boils down to whether Sgt. Wollmershauser had "fair notice" that shooting an unarmed man in the back while that man was kneeling on the floor, with his hands in the air, constituted an unconstitutional act. The answer to that question is yes. As of the date on which Wollmershauser shot Mr. Starks (March 25, 2014), the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing any threat to the officer or others. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead"); *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003) (where person posed no immediate threat to the officer or others, deadly force was not justified to apprehend fleeing suspect); *Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008) ("We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself"; "it is clearly established law that deadly force

cannot be used when it is unnecessary to restrain a suspect or secure the safety of officers, the public, or the suspect himself"); *Estate of Booker v. Gomez*, 745 F.3d 405, 428 (10th Cir. 2014) (decided March 11, 2014) ("there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect or detainee who already has been subdued and does not present a danger to himself or others"); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666-67 (10th Cir. 2010) (use of Taser could constitute excessive force where reasonable jury could conclude that the plaintiff did not pose an immediate threat to the officer or anyone at the scene).

While the cited cases involved facts that are not identical to those in this case, the evidence in this case presents an "obvious case" of an objectively unreasonable use of deadly force. If, as Mr. Jones has stated, Mr. Starks had his hands in the air, then it was clear to the officers that he was not holding a gun or posing any threat. That is the crux of the genuine dispute in this case. If the jury believes Mr. Jones instead of the officers regarding the location of Mr. Starks's hands, then the jury could reasonably determine that Mr. Starks did not pose a threat to the officers or anyone else, such that Sgt. Wollmershauser's shooting Starks in the back was objectively unreasonable under the circumstances. Summary judgment on qualified immunity grounds is accordingly inappropriate.

### 3. Punitive Damages

Wollmershauser's final argument is that the plaintiffs have failed to plead sufficient facts that would subject him to an award of punitive damages. Punitive damages are recoverable against a defendant, like Sgt. Wollmershauser, who is sued in his individual capacity under § 1983, where the individual's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461

11

U.S. 30, 35, 54 (1983). As noted, there are material fact issues bearing on the reasonableness of Sgt. Wollmershauser's actions. Crediting the plaintiff's evidence as is required at this stage, Wollmershauser shot Starks – who was unarmed, kneeling on the floor, with his hands in the air – in the back. A reasonable jury could find such conduct to involve reckless or callous indifference to Mr. Starks's federally protected rights. Accordingly, Wollmershauser is not entitled to summary judgment on punitive damages.

### B. Claims Against the City

#### 1. Section 1983 Claims

The City seeks summary judgment on plaintiffs' § 1983 claims against it on two grounds. First, the City asserts that, absent a predicate constitutional violation by Sgt. Wollmershauser, the City cannot be liable for any alleged policy. (Doc. 34 at 17). As discussed at length above, there are genuine disputes of material fact that preclude summary judgment on plaintiffs' Fourth Amendment excessive force claim against Sgt. Wollmershauser. For that reason, the City is not entitled to summary judgment on its first argument.

The City next argues that it is entitled to summary judgment under the law governing claims against municipalities. (Doc. 34 at 19). A municipality may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)).

To hold a municipality liable under § 1983, a plaintiff must prove (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the

policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694 (citations omitted). The requirement of a policy or custom distinguishes the "acts of the municipality from acts of employees of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479.

Plaintiffs assert that the City ratified Sgt. Wollmershauser's conduct by accepting the results of an Internal Affairs inquiry and the determination of the Deadly Force Review Board that Wollmershauser's actions were within policy. (*See* Doc. 37 at 23). There is a temporal problem inherent in the plaintiffs' ratification theory. The City's post-shooting review could not have been the direct cause of (or "moving force" behind) the shooting that occurred *before* the review. In short, there is obviously no causal link between Mr. Starks's death and the City's alleged ratification of the shooting after his death. Mr. Starks died before the review and the City's alleged ratification thereof. Thus, the ratification could not have caused the constitutional injury, and the causation requirement of a *Monell* claim is absent.

In addition, the City's after-the-fact finding as to the shooting is a one-time occurrence, rather than the policy or custom necessary to satisfy *Monell*. The plaintiffs do not provide any evidence of a City policy or custom of approving similar, *prior* deadly shootings by its officers that would have effectively served as a policy that was the moving force behind Wollmershauser's shooting of Mr. Starks. Similarly, that the City has "implemented no changes in use of force training" and has "declined to implement a policy requiring Special Investigative Division entry teams to carry less-lethal alternatives such as Tasers" after the shooting of Mr. Starks suffers from

the same temporal / causation problem. (*See* Doc. 37 at 15). Accordingly, the City is entitled to summary judgment on the plaintiffs' ratification claim, which is plaintiffs' Second Claim.

Plaintiffs' Third Claim for Relief against the City under § 1983 is premised upon a theory of negligent training and supervision. (Doc. 20 at ¶¶ 33-36). The Supreme Court has reiterated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. With respect to a failure to train or supervise, a municipality may only be liable where "the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390.

The Supreme Court has recognized "limited circumstances in which an allegation of a 'failure to train' can be the basis for [§ 1983 municipal] liability." *Canton*, 489 U.S. at 387. "The touchstones of this inquiry, therefore, are the risk inadequate training poses and the city's awareness of that risk." *Brown v. Gray*, 227 F.3d 1278, 1288-89 (10th Cir. 2000). In *Connick*, the Supreme Court further elaborated on the deliberate indifference required to impose municipal liability under § 1983 for a failure to train:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities. . . ."
>
> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know

> or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference'- necessary to trigger municipal liability." Without notice in a particular respect, decision-makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

563 U.S. at 61-62 (internal citations and quotations omitted). The Supreme Court also noted that it had not foreclosed "the possibility that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations," but reiterated that such liability is only available in a "rare" case involving a "narrow range of circumstances." *Id.* at 64 (quoting *Bryan County*, 520 U.S. at 409); *see also id.* at 72 (Scalia, J., concurring) (characterizing such claims as "rare").

With respect to identifying a specific policy or training failure, the plaintiffs provide the affidavit and report of their expert, Michael D. Lyman, Ph.D. (Doc. 37-9). Dr. Lyman opines that the City of Tulsa failed to provide proper scenario-based deadly force training or "shoot-don't shoot" training. (Doc. 37-9 at 25). He also suggests that the City should have required that Sgt. Wollmershauser and others with the entry team were equipped with less-lethal weapons such as Tasers. (*See id.* at 23-24 [specifically attributing such a failure to Wollmershauser]).

The plaintiffs have not cited any legal authority requiring that police departments provide "shoot-don't shoot" training or ensure that their officers are equipped with Tasers or other less-lethal equipment. Some of the federal appellate courts have rejected the less-lethal weapons theory of municipal liability. *See, e.g., Carswell v. Borough of Homestead*, 381 F.3d 235, 245 (3d Cir. 2004) ("we have never recognized municipal liability for a constitutional violation because of failure to equip police officers with non-lethal weapons"); *Plakas v. Drinski*, 19 F.3d 1143, 1150-51 (7th Cir. 1994) (rejecting claim that a county violated a suspect's constitutional rights by failing to equip its police officers with alternatives to deadly force, stating "we think it is clear that the

Constitution does not enact a police administrator's equipment list"); *see also generally Salas v. Carpenter*, 980 F.2d 299, 309-310 (5th Cir. 1992) (determining that the Constitution does not "mandate that law enforcement agencies maintain equipment useful in all foreseeable situations"); *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) ("The Fourth Amendment does not require 'the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under *Tennessee v. Garner* and *Graham v. Connor*. . . .") (quoting *Plakas*, 19 F.3d at 1149).

The determinations by those appellate courts are consistent with the general principles applied to constitutional claims in the Supreme Court and this Circuit. *See, e.g., Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) ("the reasonableness standard does not require that officers use alternative less intrusive means"); *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) ("We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the lease intrusive means in the course of a detention, only a reasonable one."); *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983) ("The reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means."). While it does not appear that the Supreme Court has weighed in on the specific issue, language in *City of Canton* is pertinent here: "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." 489 U.S. at 392. This is why evidence of deliberate indifference is required to maintain a claim. *See id.* at 1197.

The undersigned has identified one Tenth Circuit case on the issue of "shoot-don't shoot" training, which was not cited in either side's briefing. In *Zuchel v. City and County of Denver, Co.*, 997 F.2d 730 (10th Cir. 1993), the Tenth Circuit affirmed a trial court's denial of a motion

for judgment notwithstanding a jury verdict awarded to plaintiffs whose child was killed by a Denver police officer. In doing so, the court relied upon evidence that, two years before the shooting at issue, the City of Denver Police Chief received a letter from the Denver district attorney which established that there had been "six police-citizen encounters involving deadly force . . . within a six-week period," which "support[ed] a reasonable inference that such encounters were a usual and recurring problem" in the City of Denver. *Id.* at 737-39. The letter contained a specific recommendation from the district attorney that the City of Denver institute or expand training to minimize the likelihood of a violent confrontation and establish "periodic target course 'shoot-don't shoot' live training under street conditions, particularly for officers on the front line." *Id.* at 738. Plaintiffs presented evidence that the City made no effort to implement that recommended periodic live range training after receiving the letter. *Id.*

The Tenth Circuit in *Zuchel* determined that the evidence was "clearly sufficient to support the jury's determination that the Denver police training program in place prior to the Zuchel shooting was inadequate, and that a direct connection existed between the inadequacy and the shooting." *Id.* at 740. The court cited the same evidence as "sufficient to sustain the jury's determination that the Denver Police Department was deliberately indifferent to the rights of persons with whom the police come in contact." *Id.*

The evidence in this case is distinguishable from that in *Zuchel*. Most notably, plaintiffs have not presented any evidence like the Denver district attorney's letter that was central to the court's decision in *Zuchel*. That distinction is crucial due to the Supreme Court's mandate that, to prevail on a claim of insufficient training, plaintiffs must present evidence that "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61-62.

17

The circumstances of this case are more akin to the claims asserted in *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003). In *Carr*, the Tenth Circuit affirmed summary judgment for a municipality on numerous alleged failures to train, including an allegation of a failure to provide particular "shoot/don't shoot" training where officers are confronted with non-lethal weapons. In affirming summary judgment for the municipality, the court noted that the plaintiff had not provided any evidence of "how the City had notice that its actions (or failures to act) were likely to result in constitutional violations" and had not "illustrated how the City consciously chose to disregard the risk of harm." *Id.* at 1229.

The evidence does not support any reasonable finding of a direct causal link between any alleged failure to provide specific training and the shooting of Mr. Starks. As noted, the evidence, construed in favor of the plaintiffs, is that Starks was shot in the back, while kneeling on a floor, unarmed, with his hands in the air. The plaintiffs have not pointed to any City training policy that permitted a police officer to fire a gun under such circumstances. Plaintiffs have likewise not explained how the absence of specific scenario based or shoot-don't shoot training caused Wollmershauser to shoot Mr. Starks while his hands were in the air. *See Carr*, 337 F.3d at 1232 ("one thing is certain: [The officers] were not trained by the City to shoot [a suspect holding a 4-inch piece of concrete] in the back after he no longer posed a threat. In sum, even if some inadequacy in training had been shown, [the plaintiff] cannot demonstrate how it was a direct cause of the officers' actions and of [the decedent's] consequent death.").

Finally, the evidence in this case simply does not support the plaintiffs' contention that Sgt. Wollmershauser did not receive scenario based training which included training as to when to use deadly force. It is undisputed that the TPD Police Academy curriculum "includes classroom instruction on 'Use of Force,' in the field training and *scenario based training on use of force up*

18

*to and including deadly force.*" (Doc. 37 at 8, ¶ 3) (emphasis added). Sgt. Wollmershauser himself "received several hours of classroom training and scenario based training in the use of force up to and including deadly force," and he received additional update "Use of Force" training on February 12, 2014, just weeks before the shooting of Mr. Starks. (Doc. 33-1 at 3, ¶ 5; *see also* Doc. 37 at 9, ¶¶ 7, 10).[4] It is also uncontroverted that the TPD has a written policy and procedure on the use of force, including deadly force. (Doc. 37 at 10, ¶ 11; *see* Doc. 34-6). The policy recites many of the general *Graham* factors as well as other legal principles set forth in Supreme Court Fourth Amendment cases (*see* Doc. 34-6 at 2). The City is entitled to judgment as a matter of law as to plaintiffs' Third Claim.

    **2.    OGTCA Claim**

The City argues that the state law claim fails because plaintiffs have not established a violation of the Fourth Amendment. (*See* Doc. 34 at 26-27). The Court has already found the existence of genuine disputes of material fact regarding Wollmershauser's use of deadly force, which preclude summary judgment on the excessive force claim against him. Because the City's sole argument for summary judgment on the OGTCA claim is based on its argument that Wollmershauser acted appropriately, the City is not entitled to summary judgment on that claim.[5]

---

[4]     While plaintiffs cite evidence that Officers Criner and Kirby, who were present at the time of the shooting of Mr. Starks, had not received "shoot-don't shoot" training with the TPD (*see* Doc. 37 at 14, ¶¶ 3, 4), those officers did not shoot Mr. Starks; Sgt. Wollmershauser – who undisputedly has received such scenario-based use of force training – shot him.

[5]     The OGTCA claim appears to be premised upon a similar theory as plaintiffs' § 1983 failure-to-train theory, which the Court has determined is subject to summary judgment. However, the City provided no argument, analysis, or authority to indicate that the state law claim should fail for the same reasons as the § 1983 failure-to-train claim. The Court must consider the arguments before it, and it would be unfair to the plaintiffs to grant summary judgment on a claim based upon an argument that the City did not make and which the plaintiffs thus had no opportunity or obligation to dispute in their response to the motion.

## IV. Conclusion

For the foregoing reasons, Sgt. Wollmershauser's motion (Doc. 33) is **denied**, and the City's motion for summary judgment (Doc. 34) is **granted in part and denied in part**.

SO ORDERED this 31st day of March, 2019.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT